**FILED - GR**

August 13, 2009 3:16 PM

TRACEY CORDES, CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: _aid____/_____

Heather A. Bell (P66451)
Sara E.D. Fazio (P62046)
Sean P. Fitzgerald (P60654)
Kreis, Enderle, Hudgins & Borsos, P.C.
171 Monroe Ave. N.W., Suite 900B
Grand Rapids, MI 49503
(616) 254-8400
heather.bell@kreisenderle.com

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **KRAIG S. IVIE, an individual,** | **Case No.: CV-09-**    **1:09-cv-751** |
| | **Gordon J Quist** |
| | **COMPLAINT**    **U.S. District Judge** |
| **Plaintiff,** | |
| | |
| **vs.** | |
| | |
| **DIVERSIFIED LENDING GROUP, INC., a California corporation, and JACKSON NATIONAL LIFE INSURANCE CO., a Michigan corporation.** | |
| | |
| **Defendants.** | |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff KRAIG S. IVIE, an individual, respectfully submits this Complaint

against Defendants DIVERSIFIED LENDING GROUP, INC., a California corporation,[1]

---

[1] All claims asserted against Diversified Lending Group have been stayed pursuant to the March 10, 2009
Stipulation and Order filed regarding *Consent to Issuance of Preliminary Injunction and Other Relief, and
Request for Limited Relief from Asset Freeze* (a copy of which is attached as **Exhibit A**), issued in the
action entitled *Securities and Exchange Commission v. Diversified Lending Group Bruce Friedman,
Applied Equities, Inc., et al.*, Case No. CV-09:01-01533-R-(JTLx). Subject to the stay, Plaintiff is
including DLG as a Defendant, and continuing to pursue his claims against Jackson National Life
Insurance Co.

and JACKSON NATIONAL LIFE INSURANCE COMPANY, a Michigan corporation, and alleges and states as follows:

## PARTIES

1.      Plaintiff Kraig S. Ivie ("Ivie") is a resident of the State of Michigan, residing in Vicksburg.

2.      Defendant Diversified Lending Group, Inc. ("DLG") is a California corporation with its principal place of business in Sherman Oaks, California. DLG's principal, president and/or Chief Executive Officer is Bruce Friedman ("Friedman"). DLG is a licensed mortgage company in California.

3.      Defendant Jackson National Life Insurance Company ("Jackson") is a Michigan corporation with its principal place of business in Lansing, Michigan.

## JURISDICTION AND VENUE

4.      Jurisdiction is predicated on subject matter jurisdiction under 28 U.S.C. § 1331, because Plaintiff's claims arise under 18 U.S.C. § 1964.

5.      This Court has personal jurisdiction over Defendant Jackson because Jackson is a Michigan corporation with its principal place of business within the State.

6.      This Court has personal jurisdiction over Defendant DLG because it was transacting business and selling its investments in Michigan, despite the fact that it was not registered or licensed by the State of Michigan.

7.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because Defendant Jackson resides and conducts business in this District and material events giving rise to this action occurred in this District.

### BACKGROUND

8.     This matter arises out of a fraudulent investment scheme perpetrated by DLG and Jackson against Ivie.

9.     DLG represented to potential investors, including Ivie, that it was a "private real estate investment pool" whose primary business involved the "acquisition, rehabilitation and operation of income producing real estate."

10.     DLG further represented that it invested "substantially all of [its] net investable funds" in "mortgage loans and real property" with a blend of 70% in real estate and 30% in mortgage lending, while maintaining at least 3% in a cash reserve.

11.     DLG offered investments in the form of loans made by investors to DLG.

12.     The loans were one (1) or five (5) year "Secured Investment Notes" with a guaranteed return rate of either 12% or 9%, compounded monthly.

13.     The 12% rate was guaranteed by DLG, and DLG claimed that the 9% notes were guaranteed through "reinsurance" offered from an A+ rated national life insurance company.

14.     Once investors purchased the Notes, DLG continued to represent that the investment would be safe and profitable.

15.     Investors were issued an investment contract that promised the 12% or 9% rate of return, and DLG sent monthly and quarterly statements to investors in which DLG claimed that the investments were producing the results that DLG had promised.

16.     In reality, DLG's investment scheme was a fraud.

17.     DLG did not invest the money as it represented, but instead diverted substantial sums of money to Friedman for his personal use, and invested some of the money in ventures unrelated to mortgage loans or income-producing real property.

18.     DLGs' monthly and quarterly statements were fraudulent, because DLG was not profiting as claimed in the statements.

19.     Indeed, the company was insolvent.

20.     The assets that DLG alleged it owned were bogus, and it survived only because it obtained money from new investors to pay the withdrawals of the prior investors.  In short, DLG was a Ponzi scheme.

21.     The "reinsurance" of the 9% notes was fraudulent as well, because the investment was not insured as stated.

22.     Instead, when investors chose to reinsure their principal investment, DLG purchased an annuity from Jackson in an amount of approximately ten percent of the value of the investment.

23.     DLG then assigned the annuity to the investor, but did not tell the investor that the annuity was only a fraction of the value of the investment.

24.     The annuity assignment did not state that the value of the annuity was only a fraction of the value of the investment.

25.     Instead, the annuity assignment stated that the "Loan No. or Description of Liability" was "Not more than" the amount of the investment, with a reference to the DLG loan.

26.     The reinsurance clause contained in the DLG contract guaranteed that the principal investment with DLG would be reinsured.

27.     Upon information and belief, Jackson knew that DLG represented to its investors that the annuity-assignments were reinsurance of DLG investments.

28.     Upon information and belief, Jackson knew that the annuity-assignments were offered as part of a fraud meant to bilk DLG investors.

29.     Upon information and belief, Jackson further knew that the annuity-assignments offered to investors were worth only 10% of the apparent face value of the policy and the underlying investment with DLG.

30.     On November 21, 2008, the State of Michigan Department of Labor & Economic Growth Office of Financial and Insurance Regulation issued an *Order to Cease and Desist* against DLG (the Order is attached as **Exhibit B**), finding, *inter alia*, that DLG had violated Section 301 of the Michigan Uniform Securities Act, as amended, MCL 451.501 *et seq.* and MCL 451.701 for engaging in the unlawful sale of unregistered securities, without having secured a license or registration from the State of Michigan.

31.     The Order required that DLG repay Michigan investors their investment, plus 6% interest.

32.     On March 4, 2009, the United States Securities and Exchange Commission filed a Complaint against DLG, Friedman, and others, alleging that DLG had violated antifraud "provisions of the federal securities laws by misrepresenting their use of investor proceeds," effectively bilking investors out of roughly $216 million (the "SEC Action"). The SEC Action remains pending in the U.S. District Court for the Central District of California.

*Mr. Ivie's Investment in DLG.*

33.    Mr. Ivie became aware of DLG sometime in March or April 2007 while employed by, and President/owner of, American Benefits Concepts, Inc., a Michigan corporation that engaged in the business of selling insurance ("ABC").

34.    Jason E. Juberg, an employee and Vice President of ABC, was approached by Chad Reynolds ("Reynolds") and Kevin Mehlman ("Mehlman"), representatives of DLG, regarding "marketing the DLG opportunity" and was presented with several DLG marketing materials, including the *Information Circular*, which is attached as **Exhibit C**.

35.    Upon information and belief, prior to the time that Reynolds and Mehlman worked as representatives for DLG, both had been employed as wholesale marketers for Jackson.

36.    Upon information and belief, Mehlman is Friedman's step-son.

37.    Mr. Ivie was then contemplating the sale of ABC to Juberg and another ABC employee, Matthew Harper ("Harper").

38.    After selling ABC to Juberg and Harper in September 2007, however, ABC began to market DLG investments.

39.    Juberg reiterated to Mr. Ivie that DLG offered what appeared to be a safe and profitable investment, particularly the 9% reinsured investment.

40.    Ivie received and reviewed a power point presentation from DLG, which represented the following: (1) DLG held "$552MM and over 100 properties in 48 States and Internationally;" (2) DLG is the "2nd Largest Private Real Estate Investment Pool-Citibank is #1....for now;" and (3) DLG's "Debt Ratio less than 10%-Most Insurance Companies are 45%-70%." A copy of the Power Point presentation is attached as **Exhibit D**.

6

41.    The DLG power point presentation also stated that "DLG operates the second largest private investment pool in the Western U.S. with over $1.5 Billion in market value real estate. *$1 Billion ahead of what they paid cash for.*"

42.    DLG further represented that it had "over 24 years of continued operations."

43.    DLG also produced and shared with Ivie a copy of a letter dated March 12, 2007, written by legal counsel, Caceres & Shamash, LLP, stating that the DLG product "would not be classified as a "Security" under the current [SEC] regulations." A copy of counsel's letter is attached as **Exhibit E**.

44.    Ivie talked to other representatives of DLG about DLG's investments, who reiterated that DLG was a safe and conservative investment because DLG invested in income-producing real estate, and because the 9% notes were guaranteed by an A+ rated insurance company that issued "reinsurance" policies to reinsure Mr. Ivie's principal investment.

45.    On September 27, 2007, in reliance on DLG's representations and solely because he believed his principal investment would be reinsured, Ivie invested $2,200,000.

46.    Ivie invested in the 9% reinsured notes, which DLG promised were reinsured through an A+ insurance company.

47.    Following Ivie's investment, on a monthly basis, DLG sent a "Secured Investment Statement" to Ivie, providing a balance statement of interest earned on, as well as credits and debits to Ivie's account. Copies of these secured investment statements are attached as **Exhibit F**.

48.     On a periodic basis, DLG also sent to Ivie a global statement of DLG's fund summary and investment overview in relation to the real estate market.

49.     In the global statements, DLG reiterated its "investment philosophy" "built on the following three pillars:  (1) Preservation of our investors' capital; (2) Delivering absolute returns; and (3) Having lower volatility than major traditional indices."  Copies of the DLG global statements are attached as **Exhibit G**.

50.     On December 13, 2007, DLG sent Ivie a letter announcing that DLG was "declaring a 2% bonus" for investors due to the fact that DLG's actual performance exceeded its annual performance goal.  A copy of this letter is attached as **Exhibit H**.

51.     On January 31, 2008, DLG sent Ivie another letter reporting the value of Ivie's 2% bonus for DLG contract no. 07-01408 as $11,341.13.  A copy of this letter is attached as **Exhibit I**.

52.     On December 16, 2008, DLG sent Ivie a letter disclosing for the first time Friedman's prior criminal convictions and involvement in an investigation by the U.S. Attorney's Office for the Southern District of New York in earlier years.

53.     The December 16, 2008 letter went on to represent that DLG "has always fulfilled its financing obligation on each and every investment contract" and that DLG has "more than sufficient resources to continue to meet our obligations, and to grow."  A copy of the December 16, 2008 letter is attached as **Exhibit J**.

*Jackson's role in furthering DLG's fraud.*

54.     On November 14, 2007, to "reinsure" Ivie's investment, Jackson issued an assignment ("Jackson Assignment") of an annuity that had been purchased in the name of Bruce Friedman.

55.    The annuity's value was approximately $220,000, but the Jackson Assignment did not state that sum.  Rather, the Jackson Assignment stated that the "Loan No. or Description of Liability" was "Reference No.:07-01408 – Not more than $2,200,000."  (Ivie's investment in DLG was numbered 07-01408.)    The Jackson Assignment is attached as **Exhibit K**.

56.    The underlying contract number 07-01408 issued by DLG to Ivie, incorporated by reference into the Jackson Assignment, contained a "Reinsurance Endorsement," which read, in part:

> When this endorsement is attached and executed by the company and contract owner it will amend the original contract from that of a corporate guarantee to a principal reinsured contract.  The Principal amount of the investment will be reinsured by a AA Rated or better insurance company…The company will issue or caused to be issued a "Collateral Assignment" in the principal amount of the contract investment…

The DLG contract is attached as **Exhibit L**.

57.    Upon information and belief, at the time that Jackson issued the assignment, Jackson knew or should have known that DLG had marketed the assignment to Ivie as "reinsurance" of his investment, and that the annuity value was only a fraction of the value of the investment.

58.    Several months prior to the time Ivie invested in DLG, on March 23, 2007, Jackson sent a cease and desist letter to DLG directing that DLG immediately stop representing that Jackson was a reinsurance company.

59.    In the alternative, the March 23, 2007 letter from Jackson advised that DLG "must use the following disclaimer in any materials that refer in any way to Jackson":

**Jackson National Life Insurance Company is not affiliated with this program, does not underwrite, reinsure or endorse this program, nor does it offer an opinion on the legality of Investment Notes described in these materials.**

The letter provided DLG ten (10) days to take corrective action. A copy of the cease and desist letter is attached as **Exhibit M**.

60.    At no point in time did DLG comply with Jackson's cease and desist order, nor did they ever include the disclaimer requested by Jackson regarding reinsurance.

61.    By continuing to ratify the collateral assignments like the Jackson Assignment issued to Ivie, which integrated by reference the DLG contract, Jackson knew or should have known that DLG was continuing to hold Jackson out as providing reinsurance for the DLG investor's principal investment.

62.    Ivie received various correspondence from Jackson, including one letter dated December 22, 2008, that disavowed any knowledge of the value of the Jackson Assignment. A copy of the December 22, 2008 correspondence is attached as **Exhibit N**.

63.    On November 27, 2007, Jackson sent Ivie a letter that enclosed the Jackson Assignment and named Diane Marie Cano ("Cano") as Ivie's Jackson representative. A copy of this letter is attached as **Exhibit O**.

64.    Upon information and belief, Cano not only acted as a Jackson representative, but, per correspondence dated October 11, 2007, Cano also served as President of Applied Equities, Inc. ("AEI"). AEI was the "Investment Servicing Division" for DLG. A copy of Cano's letter to Ivie dated October 11, 2007 is attached as **Exhibit P**.

65.     On February 25, 2009, following receipt of the letter from Jackson advising that Jackson was unaware of the value of the Jackson Assignment, Ivie called and had a conversation with Jackson's in-house counsel, who advised that she had been "concerned" about the DLG/JNL connection for approximately three years, and the fact that the Jackson Assignments were valued at only 10% of the underlying investment with DLG.

66.     Despite having sent DLG a cease and desist letter, with which DLG never complied, together with the expressed "concern" of Jackson's in-house counsel, Jackson continued to conduct business with DLG and to issue and ratify policies like the Jackson Assignment to Mr. Ivie.

### *Mr. Ivie's attempts to withdraw his Investment.*

67.     The following year, in December 2008, Ivie requested a withdrawal of $120,000 from his account at DLG.  Under the written terms of the agreement, Ivie was entitled to a withdrawal.

68.     Under the Cease and Desist Order, DLG was required to repay all Michigan investors their principal and 6% interest.

69.     DLG refused to remit to Ivie the money that he asked for and that he was entitled to.

70.     Ivie also requested that Jackson pay to Ivie the amounts that he was due. Jackson also refused.

### Count 1 – Breach of Fiduciary Duty against DLG

Mr. Ivie alleges and reincorporates by reference paragraphs one through seventy of this Complaint.

71.    By selling the investment to Ivie, DLG assumed a position of trust and confidence such that DLG was a fiduciary of Ivie, and owed Ivie certain fiduciary duties.

72.    As a fiduciary, DLG was required to look out for the best interests of Ivie.

73.    DLG breached its fiduciary duties by making false representations to Ivie, including falsely representing that:

    A. DLG owned $1.5 billion in real estate;

    B. DLG was financially stable;

    C. Ivie's investment in DLG was low risk;

    D. Ivie's investment was guaranteed a return of 9% annually;

    E. The principal amount that Ivie's invested was guaranteed through an A+ rated insurance company;

    F. The Jackson  Assignment was reinsurance of Ivie's entire principal investment;

    G. Ivie could withdraw his investment;

74.    DLG also breached its fiduciary duty by not investing Ivie's funds in real estate or mortgages, and by failing to repay Ivie when Ivie requested repayment.

75.    As a result of DLG's breaches of fiduciary duty, Ivie was damaged.

WHEREFORE Ivie requests that this Court enter a judgment in favor of Ivie and against DLG in the amount of $2,200,000 plus interest, costs, and attorney fees and any other relief this Court deems fair and equitable.

### Count 2 – Aiding and Abetting Breach of Fiduciary Duty against Jackson

Mr. Ivie alleges and reincorporates by reference paragraphs one through seventy-five of this Complaint.

76.    DLG was a fiduciary of Ivie, and owed Ivie fiduciary duties.

77.    DLG breached its fiduciary duties.

78.    Jackson knew that DLG breached its fiduciary duties to Ivie.

79.    Jackson knowingly joined in DLG's breach in the following ways:

A. Jackson knew that DLG marketed the Jackson Assignment to Ivie as reinsurance, but Jackson did not inform Ivie that it was not reinsurance.

B. Jackson knew that the Jackson Assignment was only valued at approximately $220,000, but Jackson represented to Ivie that it was valued at $2,200,000.

C. Jackson knew that the purpose of the Jackson Assignment was to induce Ivie to purchase the DLG investment, and Jackson participated in DLG's scheme by providing to DLG the Jackson Assignment.

80.    Jackson profited by DLG's breach of fiduciary duty.

81.    As a result of Jackson's actions in aiding and abetting DLG's breach of fiduciary duty, Ivie was damaged.

WHEREFORE Ivie requests that this Court enter a judgment in favor of Ivie and against Jackson in the amount of $2,200,000 plus interest, costs, and attorney fees and any other relief this Court deems fair and equitable.

### Count 3 – Negligent Misrepresentation against DLG

Mr. Ivie alleges and reincorporates by reference paragraphs one through eighty-one of this Complaint.

82.    DLG owed Ivie a duty to take reasonable care to ensure that the information that it communicated relating to Ivie's investment with DLG was true.

83.    DLG communicated to Ivie the following information relating to Ivie's investment with DLG:

A. That DLG owned $1.5 billion in real estate.

B.  That DLG was financially stable.

C.  That Ivie's investment in DLG was low-risk.

D.  That Ivie's investment was guaranteed a return of 9% annually.

E.  That the principal amount that Ivie's invested was guaranteed through an A+ rated insurance company.

F.  That the Annuity Assignment was reinsurance of Ivie's entire investment.

84.    DLG failed to take reasonable care to ensure that the information it communicated to Ivie was true.

85.    The information that DLG provided to Ivie was false.

86.    Ivie reasonably relied on DLG's communications.

87.    Ivie was damaged by his reliance on DLG's communications.

WHEREFORE Ivie requests that this Court enter a judgment in favor of Ivie and against DLG in the amount of $2,200,000 plus interest, costs, and attorney fees and any other relief this Court deems fair and equitable.

### Count 4 – Negligent Misrepresentation against Jackson

Mr. Ivie alleges and reincorporates by reference paragraphs one through eighty-seven of this Complaint.

88.    Jackson owed Ivie a duty to take reasonable care that the information contained in the Jackson Assignment and related correspondence with Ivie was true.

89.    The Jackson Assignment indicated that the "Loan No. or Description of Liability" was "Not more than $2,200,000.00."

90.    The Jackson Assignment contained the Reference No. of Ivie's contract with DLG, which was valued at approximately $2,200,000.00; but the Jackson Assignment was only worth approximately $220,000.

91.    Ivie reasonably relied on the Description of Liability and the Reference No. to form his belief that the Jackson Assignment was valued at $2,200,000.00.

92.    Ivie was damaged by his reliance on Jackson's misrepresentations.

WHEREFORE Ivie requests that this Court enter a judgment in favor of Ivie and against Jackson in the amount of $2,200,000 plus interest, costs, and attorney fees and any other relief this Court deems fair and equitable.

### Count 5 – Negligence against Jackson

Mr. Ivie alleges and reincorporates by reference paragraphs one through ninety-two of this Complaint.

93.    Jackson held itself out to the public and to Ivie as a professional in annuity sales and a reinsurance company.

94.    Jackson owed Ivie a duty to exercise that degree of skill and care ordinarily exercised by others in the annuity sales and investment management profession.

95.    Jackson breached that standard of care by failing to disclose to Ivie that the Jackson Assignment was worth only a fraction of Ivie's investment, when Jackson knew or should have known that DLG had represented to Ivie that the Jackson Assignment was reinsurance of Ivie's entire investment.

96.    As a direct and proximate result of Jackson's breach, Ivie suffered damages.

WHEREFORE Ivie requests that this Court enter a judgment in favor of Ivie and against Jackson in the amount of $2,200,000 plus interest, costs, and attorney fees and any other relief this Court deems fair and equitable.

### Count 6 – Breach of Contract against DLG

Mr. Ivie alleges and reincorporates by reference paragraphs one through ninety-six of this Complaint.

97.    Ivie and DLG entered into an agreement whereby Ivie invested $2,200,000 in exchange for an investment in DLG with a guaranteed 9% annual return.

98.    In addition, under the terms of the agreement, DLG agreed to purchase for Ivie a reinsurance policy, from an A+ rated insurance company, to guarantee Ivie's principal investment.

99.    DLG breached the contract by not investing Ivie's money as it promised.

100.    DLG also breached the contract by failing to purchase reinsurance from an A+ rated insurance company.

101.    DLG also breached by refusing to return Ivie's investment upon Ivie's demand.

102.    As a result of DLG's breaches, Ivie was damaged.

WHEREFORE Ivie requests that this Court enter a judgment in favor of Ivie and against DLG in the amount of $2,200,000 plus interest, costs, and attorney fees and any other relief this Court deems fair and equitable.

### Count 7 – Breach of the Duty of Good Faith and Fair Dealing against DLG

Mr. Ivie alleges and reincorporates by reference paragraphs one through one-hundred and two of this Complaint.

103.   Ivie and DLG entered into an agreement.

104.   The agreement imposed on DLG the implied duty of good faith and fair dealing.

105.   The duty of good faith and fair dealing required DLG to be honest in fact.

106.   DLG breached the duty because it was not honest in fact, in the following ways:

      A.  DLG represented to Ivie that DLG owned $1.5 billion in real estate.

      B.  DLG represented to Ivie that DLG was financially stable.

      C.  DLG represented to Ivie that Ivie's investment in DLG was low risk.

      D.  DLG represented to Ivie that Ivie's investment was guaranteed a return of 9% annually.

      E.  DLG represented to Ivie that his principal investment was guaranteed through an A+ rated insurance company.

      F.  DLG represented to Ivie that the Annuity Assignment was reinsurance of Ivie's entire investment.

      G.  DLG represented to Ivie that he could withdraw his investment.

      H.  DLG promised to invest Ivie's money in real estate or mortgages.

      I.  DLG promised to repay Ivie when Ivie requested repayment, but when Ivie requested repayment DLG did not repay.

107.   Ivie was damaged by DLG's breach of the duty of good faith and fair dealing.

WHEREFORE Ivie requests that this Court enter a judgment in favor of Ivie and against DLG in the amount of $2,200,000 plus interest, costs, and attorney fees and any other relief this Court deems fair and equitable.

### Count 8 – Breach of Contract against Jackson

Mr. Ivie alleges and reincorporates by reference paragraphs one through one-hundred and seven of this Complaint.

108.   DLG and Jackson entered into a contract for the annuity.

109.   DLG assigned its rights to the annuity to Ivie.

110.   Jackson undertook to provide Ivie the rights under the contract, thereby making Ivie a third-party beneficiary under the contract.

111.   As a third-party beneficiary, Ivie had the rights to the proceeds of the annuity.

112.   Ivie demanded that Jackson pay to Ivie the value of the annuity.

113.   Jackson refused to repay Ivie the value of the annuity.

114.   Jackson breached the contract.

115.   Jackson's breach of contract caused damage to Ivie.

WHEREFORE Ivie requests that this Court enter a judgment in favor of Ivie and against Jackson in the amount of $2,200,000 plus interest, costs, and attorney fees and any other relief this Court deems fair and equitable.

### Count 9 – Breach of the Duty of Good Faith and Fair Dealing against Jackson

Mr. Ivie alleges and reincorporates by reference paragraphs one through one-hundred and fifteen of this Complaint.

116.   DLG assigned its rights to the annuity to Ivie.

117.    Jackson undertook to provide Ivie the rights under the contract, thereby making Ivie a third-party beneficiary under the contract.

118.    Because Ivie was a third-party beneficiary, Jackson owed Ivie the duty of good faith and fair dealing.

119.    Jackson breached the duty of good faith and fair dealing in the following ways:

    A.  Jackson knew that the Jackson Annuity was marketed by DLG as reinsurance.

    B.  Jackson knew that the Jackson Annuity was marketed by DLG as insuring an investment with a principal value of $2,200,000.

    C.  The Jackson Assignment indicated that the "Loan No. or Description of Liability" was "Not more than $2,200,000."

    D.  The value of the annuity was approximately $220,000.

    E.  When Jackson issued the Jackson Assignment, Jackson listed DLG's loan number.

120.    Ivie relied on the Jackson Assignment to insure his DLG investment.

121.    Because of Jackson's breach of its duty of good faith and fair dealing, Ivie did not know that the annuity was only worth $220,000.

122.    Ivie was damaged by Jackson's breach of its duty of good faith and fair dealing.

WHEREFORE Ivie requests that this Court enter a judgment in favor of Ivie and against Jackson in the amount of $2,200,000 plus interest, costs, and attorney fees and any other relief this Court deems fair and equitable.

### Count 10 – Fraud against DLG

Mr. Ivie alleges and reincorporates by reference paragraphs one through one-hundred and twenty-two of this Complaint.

123.    Prior to Ivie's investment with DLG, DLG made the following representations to Ivie:

       A.  DLG owned $1.5 billion in real estate.

       B.  DLG was financially stable.

       C.  Ivie's investment in DLG was low risk.

       D.  Ivie's investment was guaranteed a return of 9% annually.

       E.  The principal amount that Ivie's invested was guaranteed through an A+ rated insurance company.

       F.  The Annuity Assignment was reinsurance of Ivie's entire investment.

       G.  Ivie could withdraw his investment.

       H.  DLG promised to invest Ivie's money in real estate or mortgages.

       I.  DLG promised to repay Ivie when Ivie requested repayment.

124.    When DLG made those representations, DLG knew that they were false.

125.    DLG made those representations with the intent that Ivie would rely on them.

126.    Ivie relied on DLG's representations, and was damaged as a result of DLG's misrepresentations.

WHEREFORE Ivie requests that this Court enter a judgment in favor of Ivie and against DLG in the amount of $2,200,000 plus interest, costs, and attorney fees and any other relief this Court deems fair and equitable.

### Count 11 – Fraudulent Misrepresentation against Jackson

Mr. Ivie alleges and reincorporates by reference paragraphs one through one-hundred and twenty-six of this Complaint.

127.    The Jackson Assignment stated "Loan No. or Description of Liability" as "Reference No. 07-01408 - Not more than $2,200,000.00."

128.    Ivie's investment contract with DLG was numbered 07-01408, and was valued at $2,200,000.00.

129.    The Jackson Assignment was worth approximately $220,000.

130.    The statement on the Jackson Assignment was a misrepresentation because it represented that the value of the annuity was $2,200,000, when in fact the value was approximately $220,000.

131.    Jackson knew that DLG marketed the Jackson Assignment as reinsurance.

132.    Jackson knew that DLG marketed the Jackson Assignment as reinsurance of the entire principal amount of Ivie's investment with DLG.

133.    When Jackson issued the Jackson Assignment, Jackson knew that the statement misrepresented the value of the assignment.

134.    When Jackson issued the Jackson Assignment, Jackson intended that Ivie would rely on the statement.

135.    When Jackson issued the Jackson Assignment, Jackson intended that Ivie would believe that the Jackson Assignment was reinsurance of Ivie's entire principal investment.

136.    Ivie relied on Jackson's statement.

137.    As a result, Ivie was damaged.

21

WHEREFORE Ivie requests that this Court enter a judgment in favor of Ivie and against Jackson in the amount of $2,200,000 plus interest, costs, and attorney fees and any other relief this Court deems fair and equitable.

### Count 12 – Silent Fraud against Jackson

Mr. Ivie alleges and reincorporates by reference paragraphs one through one-hundred and thirty-seven of this Complaint.

138.    Jackson knew that DLG marketed Jackson's annuities as reinsurance.

139.    Jackson knew that DLG marketed Jackson's annuities as reinsurance of the entire principal amount of investors' investments with DLG.

140.    Jackson issued the Jackson Assignment in favor of Ivie.

141.    At the time that Jackson issued the Jackson Assignment, Jackson had the duty to disclose to Ivie that the Jackson Assignment was not reinsurance of the entire principal amount of Ivie's investment with DLG.

142.    Jackson did not disclose to Ivie that the Jackson Assignment was not reinsurance of the entire principal amount of Ivie's investment with DLG.

143.    In reliance on Jackson's nondisclosure, Ivie was damaged.

WHEREFORE Ivie requests that this Court enter a judgment in favor of Ivie and against Jackson in the amount of $2,200,000 plus interest, costs, and attorney fees and any other relief this Court deems fair and equitable.

### Count 13 – Civil Conspiracy against Jackson and DLG

Mr. Ivie alleges and reincorporates by reference paragraphs one through one-hundred and forty-three of this Complaint.

144.    DLG engaged in a scheme to unlawfully defraud Ivie by selling Ivie a worthless investment.

145.    As a way to make Ivie's investment with DLG appear valuable, DLG purchased an annuity from Jackson, and assigned it to Ivie.

146.    The value of the annuity was only $220,000, and the value of Ivie's investment was $2,200,000.

147.    Jackson and DLG agreed that Jackson would sell the annuity to DLG, and that Jackson would conceal from Ivie the actual value of the annuity.

148.    To further the conspiracy between Jackson and DLG, Jackson represented to Ivie that Cano was his "Jackson representative," knowing that Cano also acted as President of AEI, DLG's Investment Servicing Division.

149.    Jackson profited by selling the annuity to DLG.

150.    Ivie was damaged by the purchasing the investment from DLG.

WHEREFORE Ivie requests that this Court enter a judgment in favor of Ivie and against DLG and Jackson in the amount of $2,200,000 plus interest, costs, and attorney fees and any other relief this Court deems fair and equitable.

### Count 14 – RICO against DLG under 18 USC §§1962(a), (b), and (c).

Mr. Ivie alleges and reincorporates by reference paragraphs one through one-hundred and fifty of this Complaint.

151.    DLG engaged in a scheme to defraud Ivie by selling Ivie a worthless investment.

152.    In furtherance of the fraudulent scheme, DLG sent Ivie several letters through the United States mail, in violation of 18 USC § 1341.

A. Exhibit F contains copies of Secured Investment Statements sent to Ivie from DLG regarding the performance/balance of his principal investment.

B. Exhibit G contains copies of certain global statements sent by DLG to Ivie regarding DLG's performance overall vis a vis the real estate market.

C. Exhibit P is a letter dated October 11, 2007, drafted by Diane Cano, president of Applied Equities, Inc. ("AEI"). AEI is the investment servicing division for DLG. Cano sent the letter to inform Ivie how DLG accepted deposits and paid withdrawals.

D. Exhibit H is a letter from DLG and AEI, dated December 13, 2007. The letter informed Ivie that his investment exceeded its annual percentage goal, and Ivie would be receiving a 2% bonus.

E. Exhibit I is a letter from DLG dated January 31, 2008, in which DLG asked Ivie how Ivie wanted to process the 2% bonus.

F. Exhibit J is a letter from DLG to Ivie dated December 16, 2008, disclosing Friedman's prior convictions and criminal activities, but reassuring investors that DLG had "sufficient resources" to make good on its investment contracts.

153. Upon information and belief, DLG sent many similar letters to many other investors.

154. Each of those letters was an instance of a racketeering activity under 18 U.S.C. § 1961.

155. The sequence of letters was a pattern of racketeering activity.

156. DLG derived income from Ivie by sending that sequence of letters, and invested all or some of that income, or the proceeds of that income, in acquisition of an interest in, or the establishment of operation of, an enterprise that is engaged in, or affects, interstate commerce. 18 USC §1962(a).

157. DLG used the sequence of letters to acquire or maintain an interest or control of an enterprise that was engaged in interstate commerce. 18 USC §1962(b).

158.    DLG was associated with an enterprise that was engaged in interstate commerce. 18 USC §1962(c).

WHEREFORE Ivie requests that this Court enter a judgment in favor of Ivie and against DLG for treble damages, in the amount of $6,600,000 plus interest, costs, and attorney fees and any other relief this Court deems fair and equitable.

### Count 15 – RICO against Jackson under 18 USC §§1962(a), (b), and (c).

Mr. Ivie alleges and reincorporates by reference paragraphs one through one-hundred and fifty-eight of this Complaint.

159.    Jackson engaged in a scheme to defraud Ivie by selling DLG an annuity valued at only $220,000, and representing to Ivie that it was security for a loan of $2,200,000.

160.    In furtherance of the fraudulent scheme, Jackson sent Ivie letters through the United States mail, in violation of 18 USC § 1341.

> A. Exhibit O is a letter from Laura Prieskorn, Vice President, Jackson Customer Service Center, dated November 27, 2007, in which Ms. Prieskorn told Ivie that Jackson had received and recorded the Jackson Assignment. Included in that letter was the Jackson Assignment.

> B. Exhibit N is another letter from Ms. Prieskorn, dated December 22, 2008. This letter responds to Ivie's inquiry regarding the value of the Jackson Assignment. Ms. Prieskorn refused to tell Ivie the value of the assignment, but was aware that the value could not be more than approximately $220,000.00.

161.    Upon information and belief, Jackson sent similar letters to many other investors.

162.    The Jackson letters are instances of a racketeering activity under 18 USC § 1961.

163.    The letters form a pattern of racketeering activity.

164.    Jackson derived income from Ivie by sending that sequence of letters, and invested all or some of that income, or the proceeds of that income, in acquisition of an interest in, or the establishment of operation of, an enterprise that is engage in, or affects, interstate commerce.  18 USC §1962(a).

165.    Jackson used the sequence of letters to acquire or maintain an interest or control of an enterprise that was engaged in interstate commerce. 18 USC §1962(b).

166.    Jackson was associated with an enterprise that was engaged in interstate commerce. 18 USC §1962(c).

WHEREFORE Ivie requests that this Court enter a judgment in favor of Ivie and against Jackson for treble damages, in the amount of $6,600,000 plus interest, costs, and attorney fees and any other relief this Court deems fair and equitable.

Dated:  August 12, 2009                    Respectfully submitted,

                                           Kreis, Enderle, Hudgins & Borsos, P.C.


                                           By: _____
                                               Heather A. Bell (P66451)
                                               Sara E.D. Fazio (P62046)
                                               Sean P. Fitzgerald (P60654)
                                               171 Monroe Ave. N.W., Suite 900B
                                               Grand Rapids, MI  49503
                                               (616) 254-8400


Dated:  August 12, 2009                    By: _____
                                               Kraig S. Ivie